UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VALINDA L. TOLLES,

      Plaintiff                         Civil Action No. 18-11462

v.                                  HON.  MARK A. GOLDSMITH
                                      U.S. District Judge
                                      HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL           U.S. Magistrate Judge
SECURITY,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff Vanlinda L. Tolles ("Plaintiff") brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Supplemental Security Income and Disability Insurance Benefits under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's motion for summary judgment [Docket #21] be GRANTED and that Plaintiff's motion [Docket #15] be DENIED.

## I.  PROCEDURAL HISTORY

      This case has a long and tangled history, most of which is not relevant to the issues currently before the Court.  On January 3, 2007, Plaintiff filed applications for Supplemental

Security Income ("SSI") and Disability Insurance Benefits ("DIB") alleging disability as of

April 1, 2006 (Tr. 238, 241). Following an administrative hearing on April 7, 2009, the

claim was denied (Tr. 1049). Upon reconsideration following an interagency Appeals

Council remand, the Administrative Law Judge ("ALJ") issued a partially favorable decision,

finding that Plaintiff was disabled as of May 26, 2011 (Tr. 1049). Because Plaintiff's date

last insured for DIB was September 30, 2006, she was found to be entitled to SSI rather than

DIB[1] (Tr. 1049).

Plaintiff appealed the denial of benefits for the period between April 1, 2006 through

May 25, 2011. Case no. 12-14771. On October 21, 2013, the Honorable George Caram

Steeh adopted Magistrate Judge Mona K. Majzoub's recommendation to remand the case to

the administrative level for further proceedings based on the ALJ's failure to sufficiently

account for Plaintiff's concentrational limitations in the hypothetical question to the

Vocational Expert. *Id., Docket #23, 25, 26.* Upon remand from the District Court, another

---

[1]

Entitlement to DIB under Title II of the Social Security Act is based on a finding of medical disability and a claimant's earning record. "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage' to total quarters ." *Arnone v. Bowen*, 882 F.2d 34, 37 (2nd Cir.1989) (citing 42 U.S.C. § 423(c)(1)(B); 20 C.F.R. § § 404.101(a), 404.130–404.133 (1988)). "'Quarters of coverage'" " include quarters in which the applicant earned certain amounts of wages or self-employment income." *Id.* (*citing* 20 C.F.R. §§ 404.101(b), 404.140–404.146 (1988)). To be entitled to DIB, a claimant must show that he was disabled prior to his date last insured ("DLI"). 20 C.F.R. § § 404.315(a)(1), 404.320(b)(2). In contrast, for an award of SSI benefits under Title XVI, a claimant must establish disability and financial need. *Willis v. Sullivan*, 931 F.2d 390, 392, fn. 1 (6th Cir.1991); 42 U.S.C. § 1382. Regardless of the alleged date of disability onset, SSI applicants are not entitled to benefits until "the month following the month" that the application was filed. 20 C.F.R. § 416.335.

ALJ found (consistent with the most recent administrative determination) that Plaintiff was not disabled until May 26, 2011 (Tr. 1049). Following two more interagency remands by the Appeals Council, Plaintiff was again found not disabled prior to May 26, 2011 (Tr. 1049).

ALJ Lawrence E. Blatnik noted in his current determination that the multiple prior decisions by multiple ALJs had been vacated (Tr. 1050, 1081, 1258-1263). Therefore, the assignments of error pertain only to the most recent administrative determination which was made by ALJ Blatnik on February 14, 2017.

On December 15, 2016, ALJ Blatnik held an administrative hearing in Lansing, Michigan (Tr. 1078). Plaintiff, represented by non-attorney representative Dannelly C. Smith, testified (Tr. 1084-1098), as did Medical Expert ("ME") Louis A. Fuchs (Tr. 1098-1107), and Vocational Expert ("VE") David E. Huntington (Tr. 1107-1121). On February 14, 2017, ALJ Blatnik found that Plaintiff could perform exertionally light work and was capable of performing her past relevant work as a balloon cutter and maintenance worker as well as a significant range of other work (Tr. 1049-1065). On January 10, 2018, the Appeals Council denied review (Tr. 1038-1041). Plaintiff filed for judicial review of the final decision on May 8, 2018.

## II. BACKGROUND FACTS

Plaintiff, born May 26, 1956 was 49 at the time of alleged onset of disability date and was 55 on May 26, 2011, which was also the date she was found to be entitled to SSI (Tr. 1049). She completed 12th grade and worked previously as a bartender, cook, balloon cutter,

lawn care worker, and maintenance worker (Tr. 316, 321).  In her January 3, 2007 application

for benefits, she alleges disability as a result of depression and back and neck pain (Tr. 315).


### A.    Plaintiff's Testimony at the December 15, 2016 Hearing[2]

*Plaintiff's representative prefaced her client's testimony by noting that the period*

*under consideration was limited to the alleged onset date of April 1, 2006 to May 26, 2011*

*and that Plaintiff had been found to be disabled from May 26, 2011 onward* (Tr. 1081).

Plaintiff then offered the following testimony as to her condition between April 1,

2006 and May 25, 2011:

Plaintiff was married briefly in 2006 (Tr. 1085).  For a portion of the relevant time

period, she lived with her daughter (Tr. 1086).  She experienced back and neck pain as well

as "constant" headaches (Tr. 1086).  Her doctors had not been able to "figure out" what was

wrong with her (Tr. 1086).  She held a driver's license but seldom drove (Tr. 1086).  She

took "a lot" of Tylenol and prescribed opiates (Tr. 1087).  She experienced only partial relief

with pain medication, and did not experience medication side effects (Tr. 1087-88).  She was

unable to walk even one block or stand for three minutes, and could sit comfortably for about

30 minutes (Tr. 1088).  She was able to carry a gallon of milk (Tr. 1088).  She did not

experience hand or finger limitations (Tr. 1088).  She used alcohol moderately and did not

---

[2]

The testimony from the earlier hearings pertaining to the now-vacated administrative determinations has been reviewed but is not included in the present summation (Tr. 39, 71, 1264, 1304).

smoke or use illicit drugs (Tr. 1089).

Plaintiff received weekly counseling from 2006 forward (Tr. 1089). She experienced sleep disturbances due to neck and back pain (Tr. 1091). She experienced discomfort performing self-care activities (Tr. 1091). She was able to make microwave meals (Tr. 1092). Plaintiff relied on her daughter, a young adult during the relevant period, to help her with household chores (Tr. 1092). Her grandson lived with her for part of the relevant period (Tr. 1092). She did not perform yard work and grocery-shopped by leaning on a regular cart or using a motorized cart (Tr. 1093).

Plaintiff's past work as a balloon cutter, as performed, required her to lift up to 20 pounds (Tr. 1094). Her chief reason for her inability to work during the relevant period was due to headaches, which kept her bedridden approximately 10 days a month (Tr. 1095-96). She received treatment at the same pain clinic from May, 2006 until around a year before the hearing (Tr. 1097). She stopped receiving pain treatment in 2015 after she underwent back surgery (Tr. 1098).

**B. ME Dr. Fuchs' Testimony**

Dr. Fuchs noted that the only orthopedic and neurological evaluation for the relevant period was a March, 2007 disability evaluation noting obesity with a limited range of spine motion but no neurological abnormalities (Tr. 1100 *citing* 493-497). He noted that the evaluation stated that Plaintiff had a normal gait (Tr. 1100). He found that the evaluation was the only record "of any consequence" during the relevant period (Tr. 1100). He noted

that treating records for the relevant period showed that Plaintiff was "alert and oriented" with normal reflexes (Tr. 1100-1101, 437-464, 744-808).  The ME noted that "objective deficits in the neurologic and orthopedic exams" were more significant than imaging studies showing degenerative disc disease and mild to moderate disc bulging or subjective complaints (Tr. 1101-1104 *citing* 1027, 1029).  He concluded for the period in question that Plaintiff experienced only obesity and degenerative disc disease of the thoracic and lumbar spine (Tr. 1105-1106).  He opined that the evidence did not support a finding that Plaintiff met or equaled the requirements for a "listed" impairment (Tr. 1106); 20 C.F.R. Part 404, Subpart P, Appendix 1.  He found that Plaintiff would have limitations in bending, squatting, and crouching and was limited to lifting 10 pounds or less (Tr. 1106).  He precluded the use of ladders, scaffolds, and vibratory implements (Tr. 1107).

### C.    Medical Evidence

### 1. Treating Sources

Plaintiff underwent steroid injections to the cervical spine in April and May, 2006 (Tr. 403, 407, 410).  She reported minimal reduction of pain from the injections (Tr. 422).  May, 2006 records by Larry Jennings, M.D. note tenderness of the thoracic spine (Tr. 464). Plaintiff was prescribed Vicodin (Tr. 464).  A June, 2006 MRI of the lumbar spine showed mild degenerative changes of the mid and upper lumbar spine with moderate changes at L5-S1 (Tr. 399, 424).  Plaintiff underwent epidural injections in August, 2006 (Tr. 388, 417). August, 2006 imaging studies of the lumbar spine show degenerative changes (Tr. 387).  The

same month, Plaintiff reported daily headaches and passing out twice in four months (Tr. 537). Dr. Jennings' October, 2006 records note that Plaintiff experienced problems sleeping (Tr. 439).

October, 2006 psychological intake records note Plaintiff's report that she was "overwhelmed and depressed [because] her adult daughter . . . informed her she will move out and take three-year-old grandchild with her" and that Plaintiff was "afraid of being alone" (Tr. 467). Plaintiff reported that she had custody of the grandson since his birth (Tr. 467). Plaintiff reported a June, 2006 DUI resulting in the loss of her driver's license (Tr. 468). She reported training as a nurse's aide and hoped to secure employment (Tr. 469). She was assigned a GAF of 50 due to depression, alcohol abuse, back pain, and financial and transportation problems[3] (Tr. 470).

January, 2007 psychological services records state that Plaintiff had not cooperated in accessing social services as recommended but was still "fearful of abandonment" (Tr. 473). She reported that she took care of grandson, fixed simple meals, took care of personal care, did laundry, shopped, drove, and handled her own finances (Tr. 486). She reported that she was unable to lift more than 10 pounds, stand for more than two minutes, or walk for more than five (Tr. 486). January through May, 2007 records by Sujatha Prasad, M.D. note

---

[3]

A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders–Text Revision* ("*DSM-IV-TR*"), 34.

Plaintiff's report of good results from Prozac (Tr. 555).  Plaintiff reported daily headaches (Tr. 556).  Dr. Prasad prescribed Motrin 800 and Flexeril for neck and back pain (Tr. 559).  In December, 2007, Plaintiff sought "partial" hospitalization treatment after reporting suicidal ideation and cutting her leg (Tr. 566, 577, 592).  Plaintiff was urged to establish treatment to "avoid inpatient services" (Tr. 584).  Plaintiff reported anxiety (Tr. 568).  She admitted to the use of cocaine once or twice a month (Tr. 569).  She denied hallucinations (Tr. 606).  Upon discharge, Plaintiff reported reduced symptoms with good sleep and concentration (Tr. 566).  Plaintiff reported that she took care of grandson during the day (Tr. 580).  She appeared agitated but fully oriented (Tr. 580).  She was assigned a GAF of 35 upon admission and 45 upon discharge[4] (Tr. 567, 583).  She noted that she felt better "and ready to move on" and "get started . . . finding job."  (Tr. 595, 600, 606).

March, 2008 records note Plaintiff's report of level "three" out of ten depression (Tr. 740).  She reported that she cared for her grandson (Tr. 740).  She exhibited a normal gait (Tr. 740).  Plaintiff denied hallucinations (Tr. 738).  An evaluation completed by counselor Laura Ungar notes that Plaintiff was socially isolated, lacked energy, and had constant headaches (Tr. 812).  Ungar noted marked limitation in interacting with supervisors and coworkers (Tr. 814).  Medical records from the same month note that she was "alert" and

_____

[4]

A GAF score of 31 to 40 indicates "some impairment in reality testing or communication OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood." *DSM-IV-TR* at 34.

"oriented" (Tr. 835).  In April, 2008, Plaintiff reported a decrease in anxiety and depression with medication (Tr. 613).  Plaintiff attributed her depression to her relationship with her daughter (Tr. 613).  Upon discharge, Plaintiff reported an improved relationship with her daughter (Tr. 614).  In August, 2008, Plaintiff sought emergency treatment for headaches which she believed were related to stress resulting from her daughter's car accident earlier in the day  (Tr. 655-656).   Plaintiff experienced good results from Dilaudid before being discharged (Tr. 657).

October, 2008 sleep studies were positive for sleep apnea and possible "restless leg syndrome (Tr. 635).  Plaintiff reported good sleep with Seroquel but declined to use it when her daughter was working the third shift due to her need to hear her grandson (Tr. 639).  Plaintiff noted that her household included two dogs and a cat (Tr. 640).   Physical examination records note Plaintiff's denial of significant joint pain and that she was "alert and oriented" (Tr. 645, 828).   Plaintiff reported "constant" headaches (Tr. 653).   She demonstrated a full range of motion (Tr. 779).

In December, 2008, Plaintiff reported renewed suicidal ideation (Tr. 692).   She reported that she was recently denied mental health services (Tr. 692).  Plaintiff was found to require supervision "until stabilized" (Tr. 694).  Plaintiff was perceived to be making threats "with no follow through most likely to gain nurturance" (Tr. 699).  Presentation was noted to be "labile and childlike and may have been rehearsed" (Tr. 702).  Plaintiff reported "'seeing' family members who died and voices she can't make out" (Tr. 708).  Treating notes

-9-

state that a diagnosis of schizophrenia-related or personality disorders was "doubtful" (Tr.

708). She exhibited clear speech and a logical thought process (Tr. 727). Notes include term

"auditory hallucinations" accompanied by a question mark (Tr. 727). She was assigned a

GAF of 30[5] (Tr. 727). Plaintiff reported "feeling better" two days later after receiving mental

health services (Tr. 697).

In January, 2009 Plaintiff reported that "she [was] hearing her grandfather and two

best friends[] mumbling in her ears" but denied that she experienced delusions (Tr. 734).

She denied hallucinations (Tr. 735). In May, 2009, Plaintiff sought emergency treatment for

situational depression due to a custody fight with her daughter over the grandson (Tr. 917).

She reported anxiety and migraines (Tr. 917). A June, 2009 medication review notes that

Plaintiff was anxious due to losing custody of her grandson to her daughter (Tr. 839, 938).

August, 2009 psychological records note severe depression along with "stress from [her]

parents' illness" (Tr. 860). In September, 2009, Plaintiff reported that bipolar episodes were

triggered by her daughter's behavior (Tr. 848). She reported that she declined to take

Seroquel on nights that her daughter was working due to her need to wake up to check on her

grandson (Tr. 936). November, 2009 records note that she was anxious about her father's

upcoming heart surgery (Tr. 836).

January, 2010 records note Plaintiff's report of chronic neck pain (Tr. 1018, 1022).

---

[5]

A GAF score of 21–30 indicates "behavior is considerably influenced by delusions
or hallucinations OR serious impairment in communication or judgment OR inability to
function in almost all areas." *DSM-IV-TR*, 34.

The following month, her anxiety was deemed "mild" (Tr. 1014).  In March, 2010, Plaintiff sought emergency treatment for back pain (Tr. 907).  She denied weakness or neurological symptoms (Tr. 907).  She demonstrated normal muscle strength and tone and a normal range of motion (Tr. 908).  She reported sadness due to the death of best friend (Tr. 931).  In June, 2010, counselor Kyle Rasmussen reported "significant gains" by attending therapy (Tr. 958). In July, 2010, Plaintiff exhibited a normal gait and appropriate affect (Tr. 928).   In September, 2010, Plaintiff reported family problems (Tr. 927).  Imaging studies of the bilateral feet showed mild to moderate osteoarthrosis of the big toes, greater on the right than left (Tr. 988).  In October, 2010, Plaintiff denied depression, anxiety, or mood swings (Tr. 926).

February, 2011 emergency records (for an injury due to broken insulin needle) note that Plaintiff was alert, oriented, cooperative, and had a normal gait (Tr. 869).  The following month, Plaintiff denied mood swings or depression (Tr. 925).  She reported that her two grandchildren kept her busy (Tr. 925).

In April, 2011, counselor Rasmussen completed a mental assessment, finding that Plaintiff experienced moderate to marked limitation in understanding, remembering, and carrying out detailed instructions; and marked limitations in concentration and the ability to work in coordination with others (Tr. 943).  A May, 2011 MRI of the cervical spine showed moderate to severe encroachment at C4-C5 (Tr. 1027).  An MRI of the lumbar spine showed moderate to advanced degenerative disc disease (Tr. 1029).  A CT of the head was

unremarkable (Tr. 1030).

In June, 2011, Rasmussen composed a letter on behalf of Plaintiff's quest for benefits, noting that she had "not made significant gains to date by attending therapy" and still experienced symptoms of depression and anxiety (Tr. 1025). He acknowledged that Plaintiff did "some care taking regarding her grandchild" (Tr. 1025). He recommended that Plaintiff continue treatment (Tr. 1025). The same month, Joel D. Miller found that Plaintiff was able to lift up to 20 pounds but was unable to sit for more than four hours a day, stand for more than half an hour, or walk for more than one hour[6] (Tr. 1036). He limited her to occasional postural activity (Tr. 1036). He found that Plaintiff would be required to recline four to six times a day for up to one hour (Tr. 1037). He noted that his findings were "a rough estimate" of Plaintiff's abilities (Tr. 1037).

## 2. Non-Treating Sources

In March, 2007, Beth Clevenger Baxter, M.A. under the direction of Terrance Mills, Ph.D., performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of back aches, headaches, and depression (Tr. 487). Plaintiff reported that she was the primary caretaker of her three-year-old grandson until one month earlier when her daughter "took back custody" (Tr. 487). She noted that she was "still the primary caretaker" for her grandson because her daughter worked (Tr. 488). Plaintiff reported that she took medication for anxiety, depression, as well as muscle relaxers and opiates for the

---

[6]Miller's finding post-dates the relevant period by several weeks.

back condition (Tr. 487). Plaintiff reported three migraine headaches a month (Tr. 488). She reported that she attended an eight-week class in 2005 and received a certification to be a phlebotomy technician and was also a certified EKG technician and had tried but failed to get a job (Tr. 488). She admitted to a June, 2006 DUI and that she was currently on probation (Tr. 488). Plaintiff reported that she got along well with family and "everybody" (Tr. 488-489). She stated that she took "care of her grandson all day, everyday" (Tr. 489).

Baxter noted that Plaintiff was well-groomed with spontaneous and well organized mental activity (Tr. 489). Plaintiff admitted that she experienced suicidal ideation the prior January, but did not act out (Tr. 489). Baxter noted that Plaintiff was fully oriented with a normal memory and judgment (Tr. 489-490). She found that Plaintiff did not meet "the full criteria" for dysthymic or depressive disorder (Tr. 489). Baxter assigned Plaintiff a GAF of 54[7] (Tr. 490).

Later the same month, Bharti Sachdev, M.D. performed a physical consultative examination on behalf of the SSA, noting Plaintiff's report that she had taken care of her grandson for the past three years (Tr. 494). Plaintiff reported that she was unable to walk for more than five minutes due to lower back pain (Tr. 494). She reported only temporary relief from epidural injections (Tr. 494). She also reported neck pain and headaches (Tr. 494). She denied auras (Tr. 494).

---

[7]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR*, at 34.

Dr. Sachdev noted no extremity tenderness and normal reflexes and sensory testing (Tr. 495). She reported that she became depressed after experiencing marital problems (Tr. 496). Dr. Sachdev recommended "aggressive lifestyle modifications" due to "deconditioning" (Tr. 497). He noted that she "answered questions appropriately" (Tr. 497).

The following month, Blaine Pinaire, Ph.D. performed a non-examining review of the treating and consultative records on behalf of the SSA, finding that due to depression, personality, and substance abuse disorders, Plaintiff experienced mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 509). He found that Plaintiff was capable of understanding, remembering, and carrying out "very short and simple instructions" (Tr. 513). Dr. Pinaire concluded that Plaintiff was capable of unskilled work (Tr. 515).

In May, 2010, Dr. Mills examined Plaintiff in a second consultative psychological examination (Tr. 863-866, 998). Plaintiff reported bimonthly counseling (Tr. 863). She denied inpatient psychiatric treatment (Tr. 863). She reported that she had not worked since being "laid off" from a bar-tending job (Tr. 863). She admitted to a DUI (Tr. 863). She reported that she did not get along well with others and was moody (Tr. 864). She reported that she watched television most of the day (Tr. 864). She had a suspended driver's license and was brought to the appointment by her mother (Tr. 864).

Dr. Mills noted that Plaintiff was ambulatory with normal movement and exhibited

good hygiene (Tr. 864).  She exhibited "shaking and tremors" and low self esteem (Tr.

864).  She reported poor concentration but denied hallucinations (Tr. 864).  She cried

"throughout much of the session" (Tr. 864).  She appeared fully oriented (Tr. 864).  Dr.

Mills diagnosed Plaintiff with depression and a panic disorder without agroaphobia and

"severe" "[physical] health and employment problems" (Tr. 865).  He assigned her a

GAF of 50 with mild impairment in concentration and moderate limitation in interacting

with others (Tr. 865).

### D.  Vocational Expert Testimony

VE classified Plaintiff's former work as a balloon cutter ("hand cutter") as unskilled

and exertionally light as described in the *Dictionary of Occupational Titles* ("*DOT*") and as

actually performed and work as an apartment maintenance worker, unskilled/heavy as

described in the *DOT* and sedentary as actually performed[8] (Tr. 1110-1111, 1118).  The ALJ

then posed the following question to the VE, describing an individual of Plaintiff's age,

education, and work background:

---

[8]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds.  The VE originally testified
that the maintenance work was actually performed at the light level then corrected himself
(Tr. 1110-1118).  Plaintiff testified that the maintenance job was performed at the sedentary
level (Tr. 1110).

> [A]ssume we have an individual who can lift or carry 20 pounds occasionally, 10 pounds frequently.  Let's assume in an eight-hour workday, she can sit, stand, or walk all for at least six hours.  She can never climb ladders, ropes, or scaffolds, occasionally climb ramps or stairs, occasionally balance, stoop, kneel, crouch, or crawl.  She would need to avoid all exposure to humidity, moving machinery, and unprotected heights, only occasional exposure to extreme cold or heat, as well as vibration, vibratory tools.  She would also be able to perform simple, routine, repetitive tasks, no fast-paced production work, work that involves [only] simple work-related decisions and routine changes and work that involves only occasional contact with the public, coworkers, or supervisors. Could an individual with those limitations be capable of doing any of her past work . . . ? (Tr. 1111-1112).

The VE found the above restrictions would allow for Plaintiff's past relevant work as a hand cutter as described by the *DOT* and as actually performed (Tr. 1112).  He found that the hypothetical individual would be unable to perform the apartment maintenance work as described by the *DOT*,  but could do the position as the position was actually performed at the sedentary level (Tr. 1110, 1112).   The VE testified that if the above-described hypothetical individual also needed to change position every 20 to 30 minutes "for brief periods" the individual could nonetheless perform the maintenance work (as performed only) and the balloon cutter position (as described by the *DOT* only) (Tr. 1115).

The VE testified that the hypothetical restrictions would also allow for the unskilled, exertionally light  work of a routing clerk (59,000 positions in the national economy); marker (162,000); and garment sorter (166,000) (Tr. 1116-1117).   He testified that if the original restrictions, combined with the amended hypothetical question, were again amended to restrict the individual to only sedentary work, the past relevant job of maintenance worker (as performed) would be available as well as the work of document preparer (62,000); sorter

(11,000); and bench assembler (22,000) (Tr. 1117-1118).

The VE stated that if the same individual required unscheduled work breaks for more than 25 percent of the workday due to the effects of pain and migraine headaches, all work would be eliminated (Tr. 1118-1119).  The VE stated that his testimony was consistent with the information found in the *DOT* except for his findings regarding position changes, time off task, and absenteeism which were based on his own professional experience as a vocational rehabilitation counselor (Tr. 1119).

### E.  The ALJ's Decision

Citing Plaintiff's medical records for the period between April 1, 2006 and May 25, 2011, the ALJ found that Plaintiff experienced the severe impairments of "degenerative disc disease [] of the cervical, thoracic, and lumbar spines; diabetes mellitus; migraine headaches; obesity; depression; and an anxiety disorder" but that none of the conditions met or medically equaled the impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 1053-1054).  As to the mental impairments, the ALJ found that Plaintiff experienced moderate limitation in activities of daily living, social functioning, and concentration, persistence, or pace (Tr. 1054-1056).  The ALJ found that Plaintiff retained the Residual Functional Capacity ("RFC") for light work with the following additional restrictions:

> She can lift or carry 20 pounds occasionally and 10 pounds frequently.  In an eight-hour work day, she can sit, stand, and walk for at least six hours; but requires frequent position changes from standing and walking to sitting every 20 to 30 minutes for three to five minutes at a time.  She can never climb ladders or scaffolds; occasionally climb ramps or stairs; and occasionally balance, stoop, kneel, crouch, or crawl.  She must avoid all exposure to

humidity, moving machinery, and unprotected heights; and is limited to occasional exposure to extreme cold or heat, vibration, or use of vibratory tools. She can perform simple, routine, and repetitive tasks; no fast-paced production work; work that involves only simple work-related decisions and routine changes; and work that involves only occasional contact with the public, co-workers, or supervisors (Tr. 1057).

Citing Plaintiff's testimony and the VE's findings, the ALJ determined that Plaintiff could perform her past relevant work as a hand cutter as actually and generally performed, and past work as a maintenance worker as actually performed (Tr. 1063). The ALJ found further that Plaintiff's RFC allowed for the additional work of a routing clerk, marker, and garment sorter (Tr. 1065, 1116-1117).

The ALJ discounted Plaintiff's allegations of disability for the relevant period, citing Dr. Sachdev's March, 2007 finding of normal strength, reflexes, and neurological signs with a normal gait (Tr. 1059). The ALJ noted that the treatment records from 2010 and 2011 did not support Plaintiff's allegations of disabling migraine headaches (Tr. 1062). The ALJ accorded "significant weight" to Dr. Fuchs' hearing testimony to the extent that the findings were consistent with the non-exertional limitations in the RFC (Tr. 1061). However, he discounted Dr. Fuchs' finding that Plaintiff was limited to sedentary work on the basis that (1) it was not consistent with the rest of his testimony and, (2) the treating and consultative records supported the finding that Plaintiff could perform light work (Tr. 1061).

As to the psychological conditions, the ALJ cited Dr. Mills' consultative findings from the same month noting Plaintiff's report that she could concentrate and "got along well with her daughter, grandson, neighbors, and her past boss and coworkers" (Tr. 1059). The

-18-

ALJ noted that while a May, 2010 report by Dr. Mills noted Plaintiff's report of "mood swings" and screaming and crying spells, she had not been referred for inpatient hospitalization (Tr. 1059-1060). Despite a depressed mood, Plaintiff was fully oriented with adequate judgment and abstract thinking (Tr. 1060). The ALJ discounted the finding of marked psychological limitation by Rasmussen and Unger, noting that Plaintiff was able to take care of her grandson from his birth in 2005 to October, 2010 (Tr. 1060, 1063). The ALJ noted that the counselors' opinions were undermined by treating records showing appropriate grooming, a normal mood and affect, and normal psychiatric examinations (Tr. 1060).

### III.  STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted). The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. *Biestek* at 139 S. Ct. at 1152; 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d

284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*). Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)).   However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe

impairment; 3) has an impairment that meets or equals the requirements of an impairment

listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she

can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has

the burden of proof at steps one through four, but the burden shifts to the Commissioner at

step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the

residual functional capacity to perform specific jobs existing in the national economy."

*Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS

Plaintiff makes three separate contentions in favor of remand, arguing first that the

ALJ erred by only partially adopting Dr. Fuchs' testimony. *Plaintiff's Brief,* 10-13, *Docket

#15,* Pg ID 2913. Plaintiff argues second that Dr. Fuch's opinion that she was limited to

sedentary work, if properly adopted, would direct a finding of disability as of Plaintiff 50th

birthday of May 26, 2006. *Id.* at 13-15. Third, she faults the ALJ for discounting her

subjective reports of pain and limitation. *Id.* at 15-26.

The reasons for rejecting Plaintiff's second argument moot her first argument

altogether. Therefore, her arguments are considered in the following order: second, first,

then third.

### A. Disability Under the Grids (Arguments One and Two)

In her second argument, Plaintiff disputes the ALJ's finding that she was capable of

exertionally light work, arguing instead that the evidence, including Dr. Fuchs' testimony,

supports the finding that she was limited to sedentary work. She contends that a finding that she was limited to sedentary work would render her disabled as of her 50th birthday. *Plaintiff's Brief* at 13-15 (*citing* 20 C.F.R. part 404, subpart P, App. 2, Rule 201.09).

Plaintiff is correct that under some circumstances, an RFC for sedentary work for an individual between the ages of 50 to 54 ("closely approaching advanced age") would direct a finding of disability under the Medical–Vocational Grids ("Grids"). 20 C.F.R. part 404, subpart P, App. 2, Rule 201.14.[9] However, even assuming as argued that Plaintiff is limited to sedentary work, she is not entitled to a finding of disability as of her 50th birthday. For starters, the application of the Grids would be predicated on a finding that the individual was unable to perform her past work. 20 C.F.R. part 404, subpart P, App. 2 (Disability under the Grids predicated on the inability to perform a claimant's past relevant work). When such individuals "have no past work experience or can no longer perform vocationally relevant past work and have no transferable skills, a finding of disabled ordinarily obtains." *Id.* In contrast here, the ALJ found at Step Four that Plaintiff was capable of performing the jobs of balloon cutter (hand cutter) and maintenance worker (Tr. 1063-1064). As such, the Grids do not apply. *See Smith v. Secretary of Health and Human Servs.*, 893 F.2d 106, 110 (6th Cir.1989)("[G]rids do not apply where a claimant is found capable of performing any past

---

[9]Rule 201.09 of the Grids, cited by Plaintiff, does not apply. Rule 201.09 applies a claimant with a "limited" education which generally correlates with a seventh to eleventh-grade education. 20 C.F.R. § 404.1564(b)(3). Plaintiff reported that she had a 12th-grade education (Tr. 321).

relevant work").

Moreover, the Step Four findings that Plaintiff could perform her past relevant work include the finding that she could perform her former job as a maintenance worker "as actually performed" at the sedentary level[10] (Tr. 1063-1064, 1100, 1112).  The Step Four determination can be supported by the finding that claimant can perform her past relevant work as "actually performed," or, "as generally required by employers throughout the national economy." SSR 82–61, 1982 WL 31387, *2 (1982).  The fact that Plaintiff performed the job at a lower exertional level than as "generally performed" does not change the Step Four findings.  The claimant "bears the burden of proving the existence and severity of limitations caused by [the] impairments and the fact that [she] is precluded from performing [the] past relevant work" either as previously performed or as generally required in the national economy. *Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 474 (6th Cir. 2003).

The VE testified that while the maintenance job was generally performed at the heavy exertional level, the job was actually performed (as described by Plaintiff) at the sedentary level (Tr. 1110, 1118).  Plaintiff's testimony that she performed the past relevant work at the sedentary level defeats her argument that she is entitled to a Step Five disability determination under the Grids.   She does not dispute that she is capable of sedentary work and in her first argument actually argues that the ALJ erred by declining to adopt Dr. Fuchs'

---

[10]Plaintiff testified that the maintenance job, as performed, required at most less than 10 pounds lifting (Tr. 1110).

sedentary work finding (Tr. 1106).  Thus, the finding that Plaintiff was capable of her past relevant work at the sedentary level defeats the focus of her first argument, *i.e.* the failure to adopt Dr. Fuchs' testimony that she was limited to sedentary work constituted reversible error.  Upon remand, if Plaintiff were found to be limited to sedentary work rather than light work, it would not change the Step Four finding that she could perform her past relevant work, as performed, as a maintenance worker (Tr. 1063).

Moreover, independent grounds exist for rejecting her first argument that the ALJ erred by finding that she was capable of exertionally light work.  *Plaintiff's Brief* at 10-13. While Plaintiff argues that the Dr. Fuchs' testimony that she was limited to sedentary work ought to have been adopted, the ALJ provided a thorough rationale for adopting only a portion of the ME's testimony (Tr. 1057, 1061).  The ALJ cited Dr. Fuchs' observation that while the record showed a limited range of motion, Plaintiff did not experience neurological symptoms (Tr. 1061).  The ALJ also noted that Dr. Fuchs' statement that Plaintiff was limited to sedentary work (Tr. 1106) was inconsistent with his other testimony that Plaintiff experienced normal reflexes, a normal gait, and unremarkable neurological state[11] (Tr. 1101-1104).  The ALJ prefaced his discussion of Dr. Fuchs' testimony by citing March, 2007 consultative examination findings of normal strength in all extremities, heel-toe walking, and

---

[11]
I conclude from my own review of Dr. Fuchs' testimony that the finding that Plaintiff was limited to lifting 10 pounds or less is somewhat of *non sequitur*, coming directly on the heels of his statement that he based his findings on the March, 2007 consultative examination showed normal reflexes and a normal gait (Tr. 1100-1101, 437-438).

-24-

normal reflexes (Tr. 1059).  Notably, the RFC composed by the ALJ reflects Dr. Fuchs'

findings of limitation in bending, squatting, and crouching and a preclusion on the use of

ladders, scaffolds, and vibratory implements (Tr. 1106-1107) by limiting Plaintiff to

occasional postural activity with a preclusion on the use of ladders, scaffolds, and vibration

(Tr. 1057).

Moreover, the fact that the record did not contain a medical opinion that stating that

Plaintiff was capable of exertionally light work for the relevant period does not change the

result. *See Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 728 (6th Cir. September 5,

2013)(ALJ not obliged to adopt any one medical opinion but rather, base the RFC on all of

the "medical and non-medical evidence").  In support of the light RFC, the ALJ noted that

Plaintiff assumed full custody of her grandson from birth to the age of three and after her

daughter came to live with them, took care of the child while the daughter was at work (Tr.

1063).   He cited March, 2011 psychiatric records showing that Plaintiff "kept busy" by

taking care of her seven and eleven -year-old grandchildren (Tr. 1063).  Further, because Dr.

Fuchs' was a non-treating source, the ALJ was under no obligation to adopt all or even a

portion of his findings.  *Gayheart v. Commissioner of Social Sec.*, 710 F.3d 365, 375 (6th

Cir. 2013)(only treating source opinions entitled to controlling weight); 20 C.F.R.

1527(c)(1-2); *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)("no special degree of

deference" accorded to non-treating source).  As such, the ALJ's rejection of Dr. Fuchs'

testimony that Plaintiff was limited to sedentary work does not constitute grounds for

remand.

### B.  Plaintiff's Allegations of Limitation

Plaintiff also takes issue with the ALJ finding that the record did not wholly support the allegations of disabling mental and physical limitation.  *Plaintiff's Brief* at 15-26.

SSR 16-3p sets forth the standard for evaluating the alleged limitations using a two-step process. 2016 WL 1119029, at *3 (Mar. 16, 2016).   First, the ALJ determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce the  alleged pain or limitation.  *Id.*   Here, the ALJ acknowledged that the impairments of degenerative disc disease of cervical, thoracic, and lumbar spines; diabetes mellitus; migraine headaches; obesity; depression; and an anxiety disorder were not only medically determinable, but also "severe," *i.e.* they created some degree of work-related limitation (Tr. 1053).

 Second, an ALJ must evaluate claims of limitation not reflected in the objective evidence.  *Id.* at *3-4.   In doing so, the ALJ must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.[12]  In other words, whether the record as a whole reflects the claimant's professed

---

[12]

In addition to an analysis of the medical evidence, 20 C.F.R. §§ 404.1529(c)(3), 416.929 list the factors to be considered in making a credibility determination:

degree of limitation.

The ALJ's finding that Plaintiff's professed degree of limitation for the relevant period was not supported by the record as a whole is well explained and supported. He summarized her testimony at length, citing her claim that headaches left her bedridden a significant portion of every month and that she was unable to walk for more than one block or stand for more than three minutes (Tr. 1058). The ALJ acknowledged that imaging studies of the lumbar spine for the relevant period showed some degree of abnormality (Tr. 1058). He acknowledged the treating records for depression and anxiety (Tr. 1059-1061). He summarized Dr. Fuchs' testimony and as noted in the previous section, provided reasons for adopting only of portion of the ME's opinion (Tr. 1061).

However, the ALJ concluded that findings of the treating consultative and examining sources, coupled with Plaintiff's statements to her providers, could not "reasonably support a conclusion" that she was unable to perform any substantial gainful activity (Tr. 1063). As to the physical complaints, the ALJ noted that the allegations of debilitating headaches was not reflected by the treating records (Tr. 1062). He cited normal examinations of the upper

_____

(i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms ... and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

and lower extremities with full strength and a neurologically unremarkable state (Tr. 1062). My own review of the record shows that Plaintiff stopped working because in her own words, she was "laid off" (Tr. 863). Contrary to her testimony of frequent and debilitating headaches, she reported to a medical source that she experienced three migraine headaches a month (Tr. 488). Plaintiff's claim that the headaches were frequent and disabling is also contradicted by her numerous statements to treating and examining sources that she was solely responsible for her grandson's care for a significant portion of the relevant period (Tr. 489).

Likewise, as to Plaintiff's psychological state, the ALJ cited counseling records from the relevant period noting that she had the exclusive responsibility of taking care of her grandson from birth to the age of three (Tr. 1062). He noted that Plaintiff reported only sporadic panic attacks and "was not entirely compliant in taking her prescribed medications or engaging in medical treatment" (Tr. 1062). He noted that as of January, 2007, Plaintiff reported that she was able to perform laundry chores, prepare simple meals, care for herself, and take care of her grandson (Tr. 1063). The ALJ cited a March, 2011 medication review noting that Plaintiff was unable to leave the house often because she had to care for her two grandchildren, ages seven and ten (Tr. 1063). The ALJ reasonably concluded that "these are not the activities and abilities of an individual who is completely unable to engage in any substantial gainful activity . . ." (Tr. 1063).

Plaintiff asserts that the ALJ provided "three unsound reasons" for discounting her

-28-

allegations, *Plaintiff's Brief* at 20. First, she faults the ALJ for characterizing her treatment for the spine condition as "conservative." *Id.* However, at no point did ALJ Blatnik state that the spinal treatment was conservative (Tr. 1049-1065). In fact, Plaintiff erroneously drew the "conservative" quote from a now-vacated earlier administrative opinion (Tr. 1216). Plaintiff then goes on to state that "the nature of fibromyalgia itself renders such a brief analysis and over-emphasis upon objective findings inappropriate." *Plaintiff's Brief* at 21. However, at the most recent hearing, Plaintiff did not allege that she experienced fibromyalgia and none of the treating records for the relevant period support such a diagnosis, much less a finding that the condition caused work-related impairments. While Plaintiff states that the case was first remanded by the Appeals Council for consideration of the allegations of fibromyalgia, the most recent Appeals Council remand order does not include instructions to consider allegations of fibromyalgia (Tr. 1258-1262). While Plaintiff elsewhere appears to analogize her back condition to fibromyalgia, where the subjective allegations of pain are not objectively measurable, the ALJ properly noted that Plaintiff's regular activities, fairly unremarkable physical examinations, and ability to take care of her grandchild undermined the claims of disability.[13]

---

[13]

In determining that the condition of fibromyalgia is disabling, the ALJ would first determine whether evidence by an acceptable medical source supports the finding that the condition is a medically determinable impairment. SSR 12-2p, 2012 WL 3104869 (July 25, 2012). Second, the ALJ considers "all of the evidence in the case record including the person's daily activities," medication, and "nature and frequency" of the claimant's treatment. *Id.* at *5. In other words, the analysis at the second prong of SSR 12-2p depends on the same factors used in crediting or discrediting a claimant's subjective allegations under

Plaintiff fails to list a second or third "unsound reason" for the determination but instead goes on to cite various portions of the record that she believes support a disability finding. While she cites psychological records where she reportedly heard her grandfather and two best friends "mumbling in her ears," at the same appointment she denied delusions or hallucinations (Tr. 734-735). Treating records from the month before note that diagnoses of either schizophrenia-related or personality disorders were "doubtful" (Tr. 708).

While Plaintiff testified that she sometimes did not get dressed or leave the house for three or more days at a time, she was able to take care of her young grandson either by herself of with the help of her daughter for the entire relevant period. October, 2006 and December, 2007 psychological treating records note Plaintiff's report that she intended to find a job (Tr. 595, 600, 606). The psychological treating records strongly suggest that Plaintiff's psychological crises were brought on largely by the anticipated trauma of having her grandson taken away from her and other family-related stressors (Tr. 467, 473, 613, 655-656, 699, 836, 839, 848, 860, 917, 938). While Plaintiff cites GAF scores assigned at the times of the exacerbation of psychological symptoms, they cannot be interpreted to apply to Plaintiff's long-term ability work-related abilities. *See Kornecky v. Commissioner of Social Security*, 2006 WL 305648, *13 (6th Cir. February 9, 2006)("[W]e are not aware of any

the second prong of SSR16-3p. Even assuming that the evidence showed that fibromyalgia was a medically determinable impairment, Plaintiff's daily activities and repeatedly normal physical examinations stand at odds with a disability finding.

statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place"); *Jordan v. Commissioner of Social Security*, 2011 WL 891198, *5 (E.D. Mich. January 14, 2011)(GAF scores "subjective opinions, representing ... snapshot of a person's level of functioning at a given moment in time, not a rating of their ability to work"). December, 2008 psychological treating records noting that Plaintiff made threats of suicide "with no follow through in attempt to gain nurturance" and possibly "rehearsed" presentation (Tr. 699, 702).  Because the ALJ's rejection of Plaintiff's professed level of limitation is well explained and supported by substantial evidence it should not be disturbed.  "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse v. Commissioner of Social Sec.*, 502 F.3d 532, 542 (6th Cir.2007)(*citing Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Accordingly, I conclude that the ALJ's determination that  Plaintiff was capable of returning to her former work or a significant range of other work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## VI.  CONCLUSION

For the reasons stated above, I recommend that Defendant's motion for summary judgment [Docket #21] be GRANTED and that Plaintiff's motion [Docket #15] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: August 28, 2019

-32-

**CERTIFICATE OF SERVICE**

I hereby certify on August 28, 2019, that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on August 28, 2019.